IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| JAMES D. BEAIRD, #354163, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 3:14-cv-01970 |
| | ) | |
| MICHAEL PARRIS, Warden, | ) | Judge Trauger |
| | ) | |
| Respondent. | ) | |

<u>MEMORANDUM OPINION</u>

Before the court is petitioner James Beaird's *pro se* petition under 28 U.S.C. § 2254 for the writ of habeas corpus, challenging his 2006 conviction in the Criminal Court for Davidson County, Tennessee. (ECF No. 1.) The respondent has filed an answer in opposition to the petition (ECF No. 21), along with a copy of the underlying state-court record (ECF No. 22). The petition is ripe for review, and this court has jurisdiction. 28 U.S.C. § 2241(d).

Upon consideration of the above-referenced filings, the court finds for the reasons set forth herein that the petitioner is not entitled to relief on the grounds asserted. The petition will therefore be denied and this matter dismissed.

I.      **PROCEDURAL BACKGROUND**

On April 5, 2006, the petitioner was found guilty by a Davidson County jury of first-degree felony murder and attempted especially aggravated robbery. He was sentenced to consecutive prison sentences of life (to be served at 100%) plus twelve years. (Judgments, ECF No. 22-1, at 60–61.) The convictions and sentences were affirmed on direct appeal. *State v. Beaird* ("*Beaird I*"), No. M2006-01931-CCA-R3-CD, 2008 WL 425923 (Tenn. Ct. Crim. App. Feb. 15, 2008), *perm. app. denied* (Tenn. Aug. 25, 2008). On February 10, 2009, the petitioner filed a timely *pro se* petition for post-conviction relief in the state trial court. (ECF No. 22-12, at 28–34.) The trial court appointed counsel and a hearing was conducted on March 20, 2012. The petitioner and his trial attorney testified at the hearing, after which the trial court entered an order denying the petition. (ECF No. 22-12, at 48–59.) That decision was affirmed as well. *Beaird v. State* ("*Beaird II*"), No. M2013-00446-CCA-R3-PC, 2014 WL 265791 (Tenn. Ct. Crim. App. Jan.

23, 2014), *perm. app. denied* (Tenn. June 20, 2014).[1]

      Mr. Beaird filed his § 2254 petition in this court on October 8, 2014. The petitioner has now filed his answer in which he concedes that the habeas petition is timely but denies that the petitioner is entitled to relief on the basis of the grounds asserted.

## II.    STATEMENT OF FACTS

      The Tennessee Court of Criminal Appeals summarized the testimony presented during trial as follows:[2]

> George McLaurine, Jr., the victim, was shot and killed at his home on the evening of March 25, 2004. The victim's mother, Mrs. McLaurine testified that her son, the victim, came home and gave her a gift and card for her birthday on March 25, 2004. Around 7:00 p.m., the victim, while talking on his cell phone, stopped and told Mrs. McLaurine that he was leaving the house. Mrs. McLaurine heard the door slam and then she heard gunshots. Mrs. McLaurine went over to the window and saw a man with the victim. The man was "shooting down at the ground." At this time, Mrs. McLaurine ran out of the house onto the front porch and asked the man, "Why are you shooting at my son?"

> Mrs. McLaurine testified that the man told the victim to take off his pants. She did not understand the man's request, and again, told the man not to hurt her son. The man then pointed the gun at her and told her, "[Y]ou better get back in the house or I will shoot you." The victim then walked towards the house and said, "Momma, go back in the house, go back in the house." According to Mrs. McLaurine, everyone went back into the house including the gunman. At one point, she was able to get a good look at the man as he stood underneath the porch light. The man kept the gun pointed on them as he walked into the house. Mrs. McLaurine recalled that she stood in front of the victim and asked the man not to shoot her son. However, when the man pointed the gun at her and said he would kill her, the victim intervened and pushed her behind a door to the den and closed the door. Mrs. McLaurine then heard her husband tell the victim to take off his pants and give them to the man. She then heard another gunshot. Mrs. McLaurine returned to the front room and saw the victim lying on the floor "gasping for breath." Her husband told her to call 911 and then he ran outside after the man. Mrs. McLaurine called 911 and told the dispatcher what happened. The victim was rushed to the hospital, but he died shortly thereafter.

> Mrs. McLaurine testified that she told the police what happened. She told the police that the gunman had been wearing a pullover jacket with a zipper on the front and a hood pulled over his head. However, she had been able to see his eyes, and they were slanted. Mrs. McLaurine told police that the gunman looked like "Kenny," a person she knew when she worked as a substitute teacher at Whites Creek High School about four years before. She also told the police that her son had been on the phone as he left the

---

      [1] The order denying permission to appeal is not in the court's record and is not available online either. The parties, however, do not dispute that the Tennessee Supreme Court denied review on June 20, 2014.

      [2] The factual findings of the state appellate court are presumed to be correct. 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

house. Later, the police showed her several photographic lineups with about six separate photographs of individual suspects in each lineup. She looked at them and told the police that some of the photographs resembled the gunman, but "they were not him." The police also showed her a picture of "Kenny." However, after looking at Kenny's photograph, she told police that Kenny was not the gunman. Eventually, Mrs. McLaurine was shown a photographic lineup with the defendant's photograph included in the lineup. She testified that the defendant's picture was number four in the lineup and that she positively identified the defendant as the gunman. She also identified the defendant in court as the gunman and stated that she had no doubt that the defendant was the man who shot her son.

On cross-examination, Mrs. McLaurine acknowledged that she was shown a lot of photographs of potential suspects. She further acknowledged that she selected photographs of individuals other than the defendant who "looked like the [gunman]"; however, she denied identifying them as the gunman. She also denied becoming confused and said, "I looked at him [the gunman] directly in his face. When he had the gun pointed at me, I looked at him directly in his eyes . . . I could identify him."

George McLaurine, Sr., the victim's father, testified similarly about the events that occurred the evening of March 25, 2004. Mr. McLaurine recalled that the victim was on his cell phone then left the house through the garage. About ten seconds after the victim left, "some shots rang out." Mr. McLaurine followed his wife out the front door to investigate. He saw a man holding the victim at gunpoint and heard his wife tell the man to not shoot her son. Everyone was ushered back inside the house, and as they entered the house, the man turned the front porch light off. While walking into the house, the man was saying, "I'm going to kill him, I'[m] going to kill him." Once inside the house, Mrs. McLaurine moved in front of the victim. The man responded, saying "if you don't move, I'm going to shoot you, too." As a result, the victim pushed Mrs. McLaurine back behind Mr. McLaurine and into the den.

According to Mr. McLaurine, the man told the victim to take off his pants, and Mr. McLaurine urged his son to comply. The victim took off his pants and threw them towards the man. "About that time a shot rang out and [the victim] hit the floor." Mr. McLaurine knelt down by the victim, and, as his wife came in from the den area, he told her to call 911. Mr. McLaurine then ran after the gunman in an attempt to catch him. Mr. McLaurine recalled that his son was shot in the head. Mr. McLaurine also recalled that the gunman was wearing a dark-hooded jacket with only his face showing. Mr. McLaurine said he saw the gunman's face, but he did not recognize him.

Mr. McLaurine testified that he viewed a number of photographs from the police. Although he narrowed his identification down to two men, he was unable to positively identify the gunman from the photographs. However, Mr. McLaurine noted that he positively identified the defendant as the gunman at the preliminary hearing, and he identified the defendant in court as the gunman. On cross-examination, Mr. McLaurine admitted that the defendant was the only individual in prison attire and handcuffs at the preliminary hearing. On re-direct, Mr. McLaurine maintained that the defendant was the man who shot his son.

Police Officer Jessie Loy of the Metropolitan Police Department testified that he responded to the shooting at the McLaurines' residence. Upon arrival, he observed that the victim had been shot in the head and was lying inside the doorway of the residence. Officer Loy recalled that he was present when the ambulance arrived to transport the victim to the hospital. Officer Loy secured the scene and notified the homicide division. He got a description of the gunman from the victim's father and placed a Be On the Look Out (BOLO) alert for the gunman. According to Officer Loy, the gunman was described as a black male, approximately 5'6" to 5'9" with a slim build and a moustache. The gunman was wearing a hooded black and red coat and blue jeans.

Several police officers testified regarding their role in securing the crime scene and the recovery, collection, and testing of the physical evidence. According to their testimony, the evidence found at the scene was photographed, collected, sealed, labeled, and taken to the property room at the police department. Among the evidence collected were Winchester .9 Luger shell casings and fragments, a copper jacketed projectile, and a pair of pants. The shell casings and fragments were tested and determined to have been discharged from the same weapon whose whereabouts were unknown. Several photographs, the ballistics report, and a diagram of the crime scene were entered as exhibits and shown to the jury.

Police Detective Charles Robinson of the Metropolitan Police Department testified that he participated in the investigation of the victim's homicide. He and other detectives began their investigation the day after the victim was shot. After speaking with the victim's parents, Detective Robinson learned that the victim had been speaking with someone on the phone when he left the house. Detective Robinson obtained the victim's cell phone and documented all of the incoming and outgoing phone calls. The last phone number listed in the victim's phone was later determined to be a number for Shayla Bryant. According to Detective Robinson, he and other detectives talked to eight or ten people in an effort to figure out who might be involved in the victim's homicide.

Detective Robinson testified that he showed the victim's parents numerous photographic lineups in attempt to identify the gunman. The first photographic lineup included a photograph of an individual named Kenny because Mrs. McLaurine had previously told him that she thought she knew the gunman because he was in one of her classes she taught as a substitute teacher. However, when viewing the photographic lineup, Mrs. McLaurine was unable to positively identify Kenny as the gunman even though she recognized Kenny's photograph as the individual whom she taught at the high school. Mr. McLaurine also did not identify anyone as the gunman from the first photographic lineup. Likewise, Mr. and Mr. McLaurine failed to identify the gunman from a second photographic lineup shown to them later on the same day.

Detective Robinson testified that he showed the McLaurines additional photographic lineups on March 27 and 30, 2004, and again, no identification was made. According to Detective Robinson, none of the photographic lineups at the time contained a picture of the defendant. Detective Robinson recalled that on March 29, 2004, the McLaurines were shown a couple hundred photographs from a police computer. At this time, Mrs. McLaurine picked out photographs of two men and explained that they looked similar to the gunman, but that they were not the individual who shot her son.

Detective Robinson testified that during the course of the investigation, he and other police detectives interviewed Shayla Bryant several times. They had confirmed that Bryant had talked to the victim the night he was shot. Although Bryant initially denied being involved in the shooting, she eventually admitted involvement and told detectives that the gunman was a man known to her as "Manny Fresh." Thereafter, she was asked to give a statement and look at some photographs in attempt to identify "Manny Fresh." Bryant identified the defendant's photograph as the individual known as "Manny Fresh." Subsequently, Detective Robinson showed the McLaurines another photographic lineup with the defendant's photograph included in the lineup. At this time, Mrs. McLaurine, without hesitation, identified the defendant as the gunman. Mr. McLaurine, however, did not identify anyone from this lineup. According to Detective Robinson, several robberies took place in 2004 where the victims were ordered to take their pants off. It seemed at the time to be "a fad that every robber would use."

On cross-examination, Detective Robinson confirmed his notes which indicated that Mrs. McLaurine picked photographs of two individuals on March 29, 2004, who closely resembled the suspect. Detective Robinson acknowledged that he interviewed other individuals as persons of interest or suspects during his investigation, including

Shayla Bryant's cousin, Latron Bryant. However, Detective Robinson recalled that Latron Bryant did not fit the physical characteristics of the gunman as described by the victim's parents. Latron Bryant was "about 75 pounds heavier than what they had described, so I didn't view him as a serious suspect at all." Detective Robinson recalled that he had many interviews with Shayla Bryant and she had said many things which were proven to be untrue; however, some information was checked out and proven to be accurate. After Detective Robinson's testimony, a stipulation was entered into evidence establishing that the defendant was at Whites Creek High School during the 1998–99 school year and the first part of the 2000 school year.

Dr. Bruce Levy, the Chief Medical Examiner for the State of Tennessee, testified that the victim's autopsy revealed that the victim suffered a gunshot wound to the right front portion of his head and died as a result. Based on the gunpowder and debris in and around the victim's wound, Dr. Levy estimated that the gun was fired between six and twenty-four inches from the victim. Dr. Levy declared that the manner of death was a homicide. Dr. Levy also noted that the victim had a small laceration along his left eyebrow, which could be consistent with being pistol whipped. Dr. Levy's autopsy report was introduced into evidence.

Shayla Bryant testified that she had been charged with first degree felony murder and especially aggravated robbery as a result of her involvement in the shooting death of the victim. According to Bryant, she became friends with the victim in 2003 and later dated the victim. During the course of their friendship, the victim would from time to time borrow Bryant's car because his car was in the shop for repairs. On one particular occasion in February, the victim became involved in an automobile accident and wrecked Bryant's car. It cost about $2,800 to repair Bryant's car, and the victim promised that he would pay for the repairs. At the time, the victim did not have the money to repair Bryant's car so he suggested that Bryant give him some money to fix his car because his car needed less money for repair. In return, he would drive Bryant back and forth to work until he could save enough money to repair her car.

Bryant testified that she agreed to pay to fix the victim's car and that the driving arrangement worked for about two weeks. However, the victim soon became tired of being a chauffeur for Bryant and told her that she was getting on his nerves because he had to stop doing what he was doing to drive her places. According to Bryant, she and the victim argued over their driving arrangement.

Bryant testified that she called the victim on March 24, 2004, to remind him to pick her up for work the next morning. However, the following morning, the victim did not pick Bryant up as planned, and as a result, she lost her job. Later that day, she got in touch with the victim and asked him why he had not taken her to work and her son to school. He replied that he had been asleep. As a result, they argued. According to Bryant, she was angry because she lost her job. She asked the victim why he did not get her car out of the shop when "he had the money to get my car out of the shop and if he did that we wouldn't have this problem." She then asked the victim to come get her and take her to the store. The victim told her he would be there in fifteen minutes but arrived two hours later, thus inciting another argument.

Bryant testified that while waiting on the victim to come pick her up, she went over to her neighbor's house and began "calling around to see if someone would take [her] to the store . . . [and] just so happened, to call [the defendant]." Bryant recalled that she had been introduced to the defendant in 2002. While she only knew the defendant by his nickname, "Manny Fresh," she was friends with the defendant and had called him about every day up until the day of the shooting. While talking to the defendant, Bryant complained about her situation with her car. In response, the defendant said, "I told you to let me holler at him." Bryant explained that the defendant's use of the word "holler" meant to "rob." Bryant told the defendant that she was not comfortable with robbing the

victim and that she would call the defendant later. After the victim arrived at her place, he drove her to her uncle's house. Bryant then borrowed her uncle's car and cell phone and agreed to follow the victim to his parent's house where he would give her $1,050 towards the car repair bill he promised to pay.

Bryant testified that while en route to the victim's house, she called the defendant. She told the defendant that the victim was going to give her part of the money owed to fix her car, and the defendant suggested that she pick him up and that he would get the rest of the money for her. So she took a detour and picked up the defendant. Thereafter, Bryant told the defendant that "when he [the victim] come and give me the $1,050 just draw down on him and take the rest of [the money], he's gonna know I did it anyway." Bryant explained that "draw down" meant that the defendant was going to pull a gun on the victim. In response, the defendant told Bryant that he did not like her plan. Bryant recalled:

> He was like, no, we ain't going to do it like that, just drop me off about four or five houses down the street and you go back and park in front of the house and leave the lights on and I will walk up beside the house and I will wait until he come out and you pull off and then I jump out on him and scare him and take the rest of the money.

Bryant testified that she dropped off the defendant a few houses down from the victim's house, at which time she first saw the defendant's gun as he pulled it out, "cocked it," and put it back in his waistband. Bryant then drove to the victim's house, parked outside, and called the victim to tell him that she was outside. The victim then came outside, gave her $1050, and asked her if she was "straight." Bryant said she was fine and told the victim to call her later. While she and the victim were talking, the defendant called Bryant's cell phone and asked her if the person she was talking to was the victim. According to Bryant, she tried to play it off by telling the defendant she would call him right back. However, after she pulled away from the victim's house and started driving down the road, she heard gunshots. Bryant claimed that she tried to call the defendant to see why he was shooting but that the defendant did not answer his phone.

Bryant testified that after hearing the gunshots she got scared and started to drive home. At this time, the defendant called her. According to Bryant, the defendant was vomiting and said, "[H]e had been shot." Bryant headed back to pick up the defendant. When she reached him, he told her that he was not shot, but that he shot the victim and believed him to be dead. When asked why the victim was shot, the defendant told Bryant that he shot the victim because "he wouldn't give me the money." Bryant said, "[Y]ou didn't have to shoot him" and told the defendant she would call the police on him. In response, the defendant pointed his gun at her and told her that he would kill her and her kids if he got in trouble. Bryant claimed that she was scared because the defendant had just killed her friend.

Bryant testified that she gave the defendant $20 for drugs then dropped him off at an apartment complex. She explained that earlier at her uncle's house, the defendant had agreed to get the money from the victim if she would buy him some "weed". At the time, she had agreed and told the defendant that he could keep any extra money taken from the victim. She then drove back to the victim's house and talked to Mrs. McLaurine. She already knew the victim was dead because she had received a phone call from her mom telling her about the shooting. The next day, Bryant went to the auto shop with the money the victim had given her the night before in attempt to get her car out of the shop. Bryant acknowledged that she had sex with the defendant one time but maintained that they did not have a relationship.

On cross-examination, Bryant acknowledged that she had lied to the police on several occasions, especially about her involvement in the victim's death. She

acknowledged that she told police that the victim sold drugs and that someone might have killed the victim over some fake drugs sold by the victim. However, Bryant insisted that her testimony at trial regarding the circumstances surrounding the victim's death was the truth. Bryant also asserted that she had never named anyone other than the defendant as the perpetrator. Bryant claimed that she lied to police because the defendant had threatened to kill her, but she decided to tell the truth because her conscience was bothering her. She acknowledged that she was hoping to get some kind of deal from the state for her testimony against the defendant.

Mrs. McLaurine was recalled to testify. She stated that she knew Shayla Bryant's cousin, Latron Bryant. He had been at her house before and was at the hospital after the victim was shot. Mrs. McLaurine asserted that Latron Bryant did not resemble the gunman who shot her son. Eric Duton testified as the custodian of records for the Metro Emergency Communications Center. She identified the tape relating to Mrs. McLaurine 911 call. The 911 tape was introduced into evidence and played for the jury. Also admitted into evidence was a stipulation that a bag containing two rocks of cocaine and plastic sandwich bags were found in the victim's bedroom.

*Beaird I*, 2008 WL 425923, at *1–7.

## III.    ISSUES PRESENTED FOR REVIEW

The petitioner presents the following claims for relief:

Ground One: that the evidence was insufficient to support the verdict (ECF No. 1, at 5); and

Ground Two: "whether post conviction counsel was ineffective for failing to raise an ineffective ass[istance] of trial counsel [claim] for a procedurally defaulted claim to accom[m]odate the 14th and 6th amendment." (ECF No. 1, at 7.)

The petitioner further explains in both his petition and memorandum in support thereof that he is presenting for the first time a claim that trial counsel was ineffective for failing to raise a defense against the charge of attempted especially aggravated robbery "in the form of statements given by detectives who were experts in the area of robbery who stated that this was not a robbery," and that the default of this claim should be excused based on the ineffective assistance of post-conviction counsel, who failed to raise this claim in the state post-conviction proceedings. (ECF No. 1, at 7; ECF No. 2, at 20.) The court construes Ground Two as asserting two claims for relief: (1) the ineffective assistance of trial counsel, for failing to introduce into evidence a statement by police officer Patrick Taylor that the crime was not a robbery; and (2) the ineffective assistance of post-conviction counsel, for failing to raise a claim of ineffective assistance of trial counsel.

## IV.    STANDARD OF REVIEW

The petition in this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). AEDPA was enacted "to reduce delays in the execution of state and federal criminal

sentences . . . and to further the principles of comity, finality, and federalism." *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (internal citations and quotation marks omitted). As the Supreme Court recently explained, AEDPA "recognizes a foundational principle of our federal system: State courts are adequate forums for the vindication of federal rights." *Burt v. Titlow*, 571 U.S. ----, 134 S. Ct. 10, 15 (2013). AEDPA, therefore, "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Id.*

One of AEDPA's most significant limitations on the federal courts' authority to issue writs of habeas corpus is found in 28 U.S.C. § 2254(d). That provision forbids a federal court from granting habeas relief with respect to a "claim that was adjudicated on the merits in State court proceedings" unless the state-court decision either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Habeas courts review the "last *explained* state-court judgment" on the federal claim at issue. *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991) (emphasis original). As the Supreme Court has advised, "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473, (2007) (citing *Williams*, 529 U.S. at 410). The Supreme Court has held that review under § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).

## V. EXHAUSTION AND PROCEDURAL DEFAULT

In addition to § 2254(d)'s limitations, AEDPA generally precludes habeas review of claims that have not been properly exhausted before the state courts or were procedurally barred by the state courts, except in very limited circumstances.

### A. Exhaustion

Section 2254(b)(1) provides that a federal court may not award habeas relief to an applicant in state custody "unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State," "there is an absence of available State corrective process," or "circumstances exist that

render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1). Exhaustion occurs once a petitioner has "give[n] the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).[3] If under state law there remains a remedy that a petitioner has not yet pursued, exhaustion has not occurred and the federal habeas court cannot entertain the merits of the claim. *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994).

### B.    Procedural Default

Even where a state prisoner has exhausted available state-court remedies, a federal court may not consider "contentions of federal law which are not resolved on the merits in the state proceeding due to [the petitioner's] failure to raise them as required by state procedure." *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977). If a "state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). And finally, if a petitioner failed to fairly present a particular federal habeas claim to the state courts but has no remaining avenue available for doing so, then the claim is deemed to be exhausted but procedurally defaulted. *O'Sullivan v. Boerckel*, 526 U.S. at 848; *Rust*, 17 F.3d at 160.

A petitioner can establish cause to overcome a procedural default in two ways. First, a petitioner may "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Objective impediments include an unavailable claim or interference by officials that made compliance impracticable. *Id.* Second, constitutionally ineffective assistance of trial or appellate counsel may constitute cause. *Murray*, 477 U.S. at 488–89. Generally, however, if a petitioner asserts ineffective assistance of counsel as cause for a default, that ineffective-assistance claim must itself have been presented to the state courts as an

---

[3] In Tennessee, review by the state supreme court is not required for exhaustion. Instead, "once the Court of Criminal Appeals has denied a claim of error, 'the litigant shall be deemed to have exhausted all available state remedies available for that claim.'" *Adams v. Holland,* 330 F.3d 398, 402 (6th Cir. 2003) (quoting Tenn. S. Ct. R. 39).

independent claim before it may be used to establish cause. *Id.* If the ineffective-assistance claim is not presented to the state courts in the manner that state law requires, that claim is itself procedurally defaulted and can only be used as cause for the underlying defaulted claim if the petitioner demonstrates cause and prejudice with respect to the ineffective-assistance claim. *Edwards v. Carpenter*, 529 U.S. 446, 452–53 (2000).

Until recently, a prisoner could not demonstrate cause for default by claiming that he received ineffective assistance of counsel during state post-conviction proceedings. *See Coleman v. Thompson*, 501 U.S. 722, 752–53 (1992) (holding that attorney error is not cause to excuse a default). The holding in *Coleman* was based on the premise that an individual does not have a constitutional right to counsel in post-conviction proceedings, so the prisoner "must bear the risk of attorney error that results in a procedural default." *Id.* (internal quotations omitted).

Recent changes in the law, however, have enabled petitioners in Tennessee to establish "cause" to excuse the procedural default of a substantial claim of ineffective assistance of trial counsel by demonstrating the ineffective assistance of post-conviction counsel in failing to raise the claim in initial-review post-conviction proceedings. *See Martinez v. Ryan*, 132 S. Ct. 1309, 1315, 1320 (2012) (creating exception to *Coleman* where state law prohibits ineffective-assistance claims on direct appeal); *Trevino v. Thaler*, 133 S. Ct. 1911, 1921 (2013) (extending *Martinez* to states with procedural frameworks that make meaningful opportunity to raise ineffective-assistance claim on direct appeal unlikely); *Sutton v. Carpenter*, 745 F.3d 787, 792 (6th Cir. 2014) (holding that *Martinez* and *Trevino* apply in Tennessee).

The Supreme Court's creation in *Martinez* of an exception to the procedural-default bar stemmed from its recognition, "as an equitable matter, that the initial-review collateral proceeding, if undertaken without counsel or with ineffective counsel, may not have been sufficient to ensure that proper consideration was given to a substantial claim." *Martinez*, 132 S. Ct. at 1318. The exception, however, is very narrow. *Martinez* does not provide relief unless (1) the ineffective assistance of post-conviction counsel occurred during the "initial-review collateral proceeding," and (2) "the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Id.* at 1318. Importantly, *Martinez* did not dispense with the "actual prejudice" prong of the standard for overcoming procedural default first articulated by the Supreme Court

in *Coleman*, 501 U.S. at 750.

To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his *actual* and substantial disadvantage." *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original)). "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000) (citations omitted). Notably, however, federal courts on habeas review "are not required to address a procedural-default issue before deciding against the petitioner on the merits." *Hudson v. Jones*, 351 F.3d 212, 215 (6th Cir. 2003).

Because the cause-and-prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the Supreme Court has recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. *Dretke v. Haley*, 541 U.S. 386, 392 (2004) (citing *Murray*, 477 U.S. at 496).

With these principles in mind, the court will turn to the examination of the claims raised in Thorne's petition for habeas relief.

## VI.    DISCUSSION

### I.    Ground One: That the Evidence Was Insufficient to Support the Verdict

The petitioner asserts that the evidence was insufficient to support a finding of guilt beyond a reasonable doubt for his convictions of felony murder and attempted especially aggravated robbery where "there was not enough evidence to enhance the charge of homicide to felony 1st degree murder, since the evidence did not support the underlining felony." (ECF No. 1, at 5.) The petitioner states that there was no "actual" evidence against him in this matter and that "only circumstantial evidence" was presented at trial. (ECF No. 2, at 7.) In particular, the petitioner argues that there is no evidence that a robbery took place. He provides the "Supplement Report" of Lt. Patrick Taylor of the Nashville Police Department as proof that he did not commit a robbery during the shooting of the victim. (ECF No. 2-1.) The petitioner also argues that the evidence was insufficient to support the jury's finding that he was the gunman.

In his direct appeal, the petitioner likewise posited a claim that the evidence was insufficient to support the guilty verdicts on the charges of felony murder and attempted especially aggravated robbery. (Pet'r's App. Br., ECF No. 22-8, at 6, 16–20.) He specifically argued both that evidence in the record did

not establish beyond a reasonable doubt the defendant's identity as the perpetrator and that the attempted robbery conviction—and thus the felony-murder conviction—were impermissibly based on the uncorroborated testimony of a co-defendant and accomplice, Shayla Bryant. The court therefore finds that the claims in this court were properly exhausted but that the petitioner is nonetheless not entitled to relief.

### A. Evidence to Support the Finding that the Petitioner Was the Gunman

Regarding whether the evidence established the defendant's identity as the perpetrator of the murder, the Tennessee Court of Criminal Appeals reasoned as follows:

> Our review begins with the well-established rule that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. Therefore, on appeal, the convicted defendant has the burden of demonstrating to this court why the evidence will not support the jury's verdict. To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); *see* Tenn. R. App. P. 13(e). In contrast, the jury's verdict approved by the trial judge accredits the state's witnesses and resolves all conflicts in favor of the state. The state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. We do not attempt to re-weigh or re-evaluate the evidence. Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences.

> Addressing the defendant's challenge to the sufficiency of the evidence as it relates to his identity, we note that the identity of an accused may be established by either direct evidence, circumstantial evidence, or a combination of the two. The credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made. Identity is a question of fact for the jury to determine after consideration of all the evidence.

> Upon review, we conclude that the evidence was sufficient to establish beyond a reasonable doubt that the defendant was the perpetrator of the crimes. Both of the victim's parents, Mr. and Mrs. McLaurine, testified that they saw the defendant's face at close proximity. Mrs. McLaurine positively identified the defendant as the gunman from a photographic lineup prior to trial. Mrs. McLaurine also told police immediately after the offense that the gunman resembled someone she had taught at Whites Creek High School. Records confirmed that the defendant was a student at this high school during the time Mrs. McLaurine taught there. In addition, both Mr. and Mrs. McLaurine positively and unequivocally identified the defendant at trial as the man who shot their son. Furthermore, the McLaurines' identification was corroborated by Shayla Bryant's testimony. Bryant testified that the defendant offered to rob the victim for her and, during the robbery, shot and killed the victim. The jury heard the testimony at trial and by its verdict accredited the witnesses' identification testimony. Accordingly, the proof of the defendant's identity as the perpetrator of the crimes was sufficient, and he is not entitled to relief on this issue.

*Beaird I*, 2008 WL 425923, at *7–8 (most quotation marks and internal citations omitted).

In considering this claim, the state court correctly cited to *Jackson v. Virginia* as the federal case establishing the appropriate standard for evaluating a constitutionally based claim that the evidence was insufficient to support the verdict. In conjunction with referencing the governing standard, the court accurately summarized the evidence in the record that supported the jury's verdict. The state court's decision was not contrary to and did not involve an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the evidence presented during the state-court proceedings. 28 U.S.C. § 2254(d). The petitioner is not entitled to relief on the basis of the petitioner's claim that the evidence was insufficient to support his identification during the trial as the perpetrator of the murder.

### B.    Evidence of Attempted Robbery

With respect to the petitioner's claim that the evidence was not sufficient to support the conviction for attempted robbery, the court notes, first, that the "Supplement Report" the petitioner seeks to introduce into evidence may not be considered by the court, because review of a state-court's decision under 28 U.S.C. § 2254(d)(1) is limited to the record that was before the state court. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).

Specifically regarding the petitioner's claim that Shayla Bryant's testimony constituted the uncorroborated testimony of an alleged accomplice and therefore was not sufficient to support the verdict, the state court addressed this issue as purely one of state law, and concluded that Bryant's testimony was adequately corroborated for purposes of state law:

> The defendant also argues that there was insufficient corroboration of accomplice Shayla Bryant's testimony. In particular, the defendant challenges Shayla Bryant's testimony that the defendant killed the victim in perpetration of a robbery. Upon review, we note that a conviction cannot be based solely upon the uncorroborated testimony of an accomplice. *State v. Bane*, 57 S.W.3d 411, 419 (Tenn. 2001). As aptly explained by our supreme court:
>
>> [t]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and

legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's [testimony].

[*State v.*] *Shaw*, 37 S.W.3d [900,] 903 [(Tenn. 2001)]. However, independent evidence, though slight and entitled to little weight when standing alone, is sufficient to corroborate accomplice testimony. The sufficiency of the corroboration is a determination for the jury.

In the present case, Shayla Bryant testified that the victim owed her money and that the defendant offered to rob the victim of the money owed. The defendant accompanied Bryant to the victim's house, ordered Bryant to drop him off a few houses away from the victim's house, and told Bryant he would get the rest of the victim's money after the victim met with Bryant. The victim met Bryant outside, and he gave her $1,050. While the victim and Bryant were talking, the defendant called Bryant to confirm the identity of the victim. After Bryant drove away from the victim's house, she heard gunshots. Later, the defendant informed Bryant that he shot the victim and believed him to be dead. The defendant told Bryant that he shot the victim because the victim would not give him the money. Bryant's testimony was corroborated by Mr. and Mrs. McLaurine's identification of the defendant as the man who shot and killed the victim. Consequently, sufficient corroborative evidence exists to uphold the defendant's convictions. The defendant is not entitled to relief on this issue.

*Beaird I*, 2008 WL 425923, at *8 (some internal citations omitted).

The rule that a conviction must be supported by more than the uncorroborated evidence of an accomplice is a state-law rule and not one of constitutional dimension. *See United States v. Gallo*, 763 F.2d 1504, 1518 (6th Cir. 1985) (rejecting a sufficiency-of-the-evidence challenge, holding that "the uncorroborated testimony of an accomplice may support a conviction under federal law"). "A violation of state law is not cognizable in federal habeas corpus unless such error amounts to a fundamental miscarriage of justice or a violation of the right to due process in violation of the United States Constitution." *Cristini v. McKee*, 526 F.3d 888, 897 (6th Cir. 2008). Under federal law, a conviction should be affirmed "if the evidence, viewed in the light most favorable to the government, would allow a rational trier of fact to find the defendant guilty beyond a reasonable doubt." *United States v. Solorio*, 337 F.3d 580, 588 (6th Cir. 2003); *see also Jackson v. Virginia*, 443 U.S. at 319. In this case, there was no apparent violation of state law: The state court found the testimony of Shayla Bryant to be corroborated by the accounts of the victim's parents, who witnessed the defendant shoot and kill their son. Accordingly, the petitioner cannot establish a fundamental miscarriage of justice or a violation of his federal right to due process.

The petitioner has not demonstrated that the evidence was insufficient to support the verdicts for attempted especially aggravated robbery and felony murder. He is not entitled to relief on the basis of this

claim.

II.     **Ground Two: Ineffective Assistance of Trial and Post-Conviction Counsel**

The petitioner asserts that his post-conviction counsel was ineffective for failing to raise a claim of ineffective assistance of trial counsel based on trial counsel's failure to introduce into evidence the "Supplement Report" of Lt. Patrick Taylor, who opined that the murder in this case did not involve a robbery.

As an initial matter, the court notes that, insofar as the petition may be construed as asserting an independent claim of ineffective assistance of *post-conviction* counsel, that claim must be denied on the basis that the petitioner does not have a stand-alone right to the effective assistance of post-conviction counsel. *See Coleman v. Thompson*, 501 U.S. 722, 752 (1991) ("There is no constitutional right to an attorney in state post-conviction proceedings."). *Martinez* did not overrule that long-standing principle. *Cf. Wallace v. Sexton*, 570 F. App'x 443, at *11 (6th Cir. 2014) ("The Supreme Court has not recognized ineffective assistance of post-conviction counsel as a free-standing constitutional claim. . . ." (citing *Martinez*, 132 S. Ct. at 1315)). Because the claim does not present a cognizable basis for federal habeas review, relief is precluded by 28 U.S.C. § 2254(a).

But the claim may reasonably be construed as asserting that trial counsel was constitutionally ineffective for failing to present Taylor's statement into evidence, and that the default of this claim resulting from the petitioner's failure to raise it in initial-review post-conviction proceedings is excused by the ineffective assistance of post-conviction counsel. As stated above, *Martinez* may permit a petitioner to overcome the procedural default of a claim of ineffective assistance of trial counsel where there was either no post-conviction counsel or post-conviction counsel was ineffective. Under *Martinez*, however, a petitioner may overcome such a default only by showing that "the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Martinez*, 132 S. Ct. at 1318 (citing *Miller-El v. Cockrell*, 537 U.S. 322 (2003) (describing standards for certificates of appealability to issue)). For a claim to be found substantial for *Martinez* purposes, "a petitioner must show that reasonable jurists could debate whether (or, for that matter, agree that) . . . the issues presented were adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 336. Conversely, a claim is "insubstantial" if "it does not have any merit or . . . is wholly

without factual support." *Martinez*, 132 S. Ct. at 1319. While this standard is not particularly demanding, the court must also consider whether the petitioner was actually prejudiced by the default. *Coleman*, 501 U.S. at 750.

Ineffective-assistance claims are analyzed, on initial review, under the standard established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, counsel's assistance is constitutionally ineffective when (1) his performance was "deficient" because he "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and (2) his "deficient performance prejudiced the defense" in a way that "deprive[d] the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. The defendant bears the burden of demonstrating deficient performance by showing "that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. He must demonstrate that he has been prejudiced by his counsel's deficiencies by showing "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

In the present case, the petitioner seeks to introduce into evidence a "Supplement Report" by Metro Police Lt. Patrick Taylor, who was one of the first police officers to arrive on the scene. The petitioner claims that his trial counsel was ineffective for failing to introduce this document into evidence and failing to call Lt. Taylor as a witness. The Supplement Report, dated March 25, 2004, states in pertinent part:

> On 3-25-04 a home invasion was put out on the radio. The Robbery Unit was in the West Nashville area doing surveillance. Robbery was requested to respond to the home invasion . . . . I left the surveillance and went to that location along with several night shift robbery detectives. I arrived at approximately 2008 hours. Patrol was on the scene and had already put up crime scene tape around the residence where the shooting occurred. I talked to the patrol sergeant in charge who stated that the victim was shot in the head and had been transported. She told me that his father was in the house. A black male walked out of the house and was introduced to me as the victim's father. I asked him what had occurred and he advised that he heard his son arguing with someone. He then heard several shots fired and walked out the front door. He told me that the gunman then ordered everyone back into the house. Once inside the house he told the victim to remove his pants. He [sic] son did so and he then shot him. . . .

> I asked him if the suspect took anything and he told me no. I asked if he demanded anything and he told me no. I asked if he knew the shooter or if he recognized him and he told me no. I told him that we would need to talk to him again. *I then told the dispatcher to notify homicide, that this was not a robbery.* . . . Officer Cecil, with Intelligence, told me that the removing of the pants is a way that gangs disrespect each other. I spoke to Mr. McLaurine, Sr. again and asked if his son was involve in a gang. He told me that he checked his son's room everyday and has never found gang stuff. . . .

(ECF No. 2-1 (emphasis added).)

The court finds that the counsel's failure to introduce this report into evidence did not prejudice the defense, because (1) the reported statements by Mr. McLaurine to Lt. Taylor were entirely consistent with his trial testimony; in particular, Mr. McLaurine stated that he heard his son in an "argument" with someone before he heard shots fired and had no idea what the "argument" concerned; and (2) Lt. Taylor's assessment that the crime was "not a robbery" and that the homicide unit should be notified instead did not address or take into account whether an attempted robbery had occurred or the underlying motive for the murder. In other words, even if admitted into evidence and believed, Lt. Taylor's statement would not have changed the outcome in this case.

Because the document the petitioner seeks to have considered would have had no effect on the jury's verdict in this case, the petitioner was not prejudiced by his counsel's failure to introduce it into evidence. In turn, the petitioner was not prejudiced by his post-conviction counsel's failure to raise this issue in the initial-review post-conviction proceeding. The court concludes that the claim is not substantial, and the petitioner was not prejudiced by the default. The petitioner is not entitled to relief on the basis of this claim.

## VII.    CONCLUSION

For the reasons set forth herein, James Beaird's petition under § 2254 will be denied and this matter dismissed with prejudice.

Federal Rule of Appellate Procedure 22 provides that an appeal of the denial of a habeas petition may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253. Rule 11 of the Rules Governing § 2254 Cases requires that a district court issue or deny a COA when it enters a final order. A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). The district court must either issue a COA indicating which issues satisfy the required showing or provide reasons why such a certificate should not issue. 28 U.S.C. § 2253(c)(3); Fed. R. App. P. 22(b). Because jurists of reason would not disagree with the court's

conclusion that the evidence was sufficient to support the verdicts against the petitioner, the court will deny a certificate of appealability as to Ground One. However, because the law concerning *Martinez* and its application by the district courts is still shifting, the court will grant a certificate of appealability as to the petitioner's Ground Two.

An appropriate order is filed herewith.

Aleta A. Trauger
United States District Judge